**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| KESHIA ALSTON, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| T-MOBILE USA, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Keshia Alston and brings this action pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*., as amended. Plaintiff alleges that Defendant T-Mobile USA, Inc. discriminated against her due to disability, including through its failure to engage in the interactive process and to provide a reasonable accommodation for her disability, and subjected Plaintiff to retaliation after she engaged in protected activities, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331, 1343, & 1391 and the enforcement provisions of the Americans with Disabilities Act, 42 U.S.C. § 12117.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. 1391 because Plaintiff was employed, and the events underlying this action, occurred in Richmond County, Georgia, which is located in this judicial district.

## PARTIES

3.

Plaintiff Keshia Alston (hereinafter, "Plaintiff" or "Alston") is a citizen of the United States and a resident of the State of Georgia. At all times relevant to this suit, Ms. Alston was employed with Defendant T-Mobile USA, Inc.

4.

At all relevant times, Ms. Alston was considered a covered, non-exempt employee under the Americans with Disabilities Act.

5.

Defendant T-Mobile USA, Inc. (hereinafter, "Defendant") is a foreign profit corporation incorporated under the laws of the State of Delaware, with its principal office located at 12920 SE 38th Street, Bellevue, Washington 98006. Defendant may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Gwinnett County, Georgia 30092.

6.

Defendant is engaged in interstate commerce, has an annual revenue in excess of $500,000.00, and has employed in excess of 500 employees, working for at least 20 calendar weeks in 2021 and in prior calendar years.

7.

Defendant is a covered employer within the meaning of the Americans with Disabilities Act.

## STATEMENT OF FACTS

8.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 7, as if the same were set forth herein.

9.

Ms. Alston began employment with Defendant in or around October 2013. Most recently, Ms. Alston was employed with Defendant at its Augusta Call Center, located at 3750 Wheeler Road, Augusta, Richmond County, Georgia 30909.

10.

While employed at Defendant's Augusta Call Center, Ms. Alston worked as a Customer Service Representative ("CSR") Account Expert, whose job duties were to assist customers with billing and to diagnose and repair mobile devices.

11.

At all relevant times, Ms. Alston was qualified for her position.

12.

At all relevant times, Ms. Alston was able to perform the essential functions of her job with or without a reasonable accommodation.

13.

At all relevant times, Ms. Alston's performance was exemplary.

14.

Ms. Alston suffers from several medical conditions that are considered disabilities.

15.

Specifically, Ms. Alston has been diagnosed with Type 2 diabetes, which is a physical impairment in the way the body regulates and uses glucose.  Type 2 diabetes is a long-term condition that results in an abnormally levels of sugar in the blood, which may result in complications and other serious health conditions such as heart disease, blindness, kidney failure, and lower-extremity amputations.  Type 2 diabetes results in neuropathy, or nerve damage, cognitive limitations such as memory loss, difficulty managing time, organizational limitations, and being more susceptible to stress.  As a result, Type 2 diabetes substantially impairs a number of Ms. Alston's major life activities, such as eating, caring for oneself, thinking, communicating, and working, and Ms. Alston experiences a substantial limitation to her endocrine system.

16.

Ms. Alston has also been diagnosed with hypertension or high blood pressure.  Hypertension is a heart condition in which the long-term force of the blood in a person's artery walls is high enough that it may result in other health problems such as heart disease.  As a result of the hypertension, Ms. Alston routinely experiences headaches and shortness of breath.  Hypertension substantially impairs a number of Ms. Alston's major life activities, including breathing, walking, performing manual tasks, and working.

17.

Ms. Alston also suffers from fibromyalgia, a disorder characterized by widespread musculoskeletal pain, accompanied by fatigue, sleep, memory, and mood issues.  As a result of her fibromyalgia, Ms. Alston often experiences widespread pain, fatigue, and cognitive limitations.  As a result, fibromyalgia substantially impairs Ms. Alston's abilities such as her mobility and ability to perform manual tasks, sleeping, caring for herself, and working.

18.

Ms. Alston has also been diagnosed with sickle cell trait, a genetic blood disorder that has the potential of resulting in pain or the onset of sickle cell disease, particularly in the event of severe dehydration or high-intensity physical activity.

19.

Additionally, on or about July 3, 2019, Ms. Alston suffered an on-the-job injury after she tripped over a metal object that one of Defendant's employees had left on the floor in a walkway.

20.

As a result of her fall, Ms. Alston sustained a contusion and abrasion to both her right knee and right elbow. Ms. Alston also experienced a strain in the lumbar region of her back. These injuries caused Ms. Alston to experience a substantial level of musculoskeletal pain and stiffness, which was worsened because of her preexisting, aforementioned medical conditions.

21.

Ms. Alston began receiving regular physical therapy in August 2019 to treat the injuries that she sustained as a result of the fall, which only required her to be out of work for several days in order to see her provider.

22.

However, while undergoing physical therapy, Ms. Alston was injured in a motor vehicle collision, which occurred on or around September 13, 2019. The car accident caused Ms. Alston to experience a herniated disc in her back.

23.

The injuries from Ms. Alston's accident combined with the injuries from the fall resulted in Ms. Alston experiencing chronic pain in her back and right knee, which made it difficult for Ms. Alston to sit idly for long periods of a time.

24.

The injuries that Ms. Alston sustained from her motor vehicle collision substantially impacted Ms. Alston's performance of major life activities such as walking, squatting, lifting, pushing, and standing or sitting for extended periods of time.

25.

Following Ms. Alston's car accident, her physician placed her on medical leave from September 17, 2019, until December 14, 2019, for the purposes of giving Ms. Alston's injuries enough time heal and recover. During this period, Ms. Alston requested and used leave pursuant to the Family and Medical Leave Act (hereinafter, "FMLA").

26.

However, on or around October 1, 2019, Ms. Alston had apparently exhausted her FMLA leave. As a result, Defendant placed Ms. Alston on short term disability (hereinafter, "STD") through a benefit that Defendant provides to its employees.

27.

Ms. Alston returned to work on December 15, 2019.

28.

However, once she returned, Ms. Alston was still experiencing extreme back and knee pain, which she found made it difficult for her to stay seated for the entire eight-hour workday.

29.

Ms. Alston discussed her ongoing pain her with medical provider, as well as Ms. Alston's desire to return to work as soon as possible.

30.

Given Ms. Alston's desire to return to her job, her medical provider recommended that Ms. Alston request that Defendant provide her with a modified schedule of working four-hour shifts, which would allow Ms. Alston to lessen the strain on her back and would not require her to sit or stand for extended periods of time.

31.

Based on her doctor's advice, Ms. Alston requested that Defendant modify and reduce her work hours accordingly as a reasonable accommodation.

32.

Defendant approved Ms. Alston's request to work a modified and reduced schedule, and from December 15, 2019, through February 1, 2020, Defendant allowed her to work a reduced number of hours.

33.

As February 2020 approached, along with the end of the approved period for a modified schedule, Ms. Alston's physician determined that this modified schedule would need to be extended because Ms. Alston was still not able to sit for a full eight-hour shift.

34.

On or around February 13, 2020, Ms. Alston's physician completed Defendant's Health Care Provider Questionnaire on her behalf.

35.

In this questionnaire, the doctor stated that Ms. Alston could not sit for longer than four hours per day, and that while the condition was expected last for at least six months, but that the duration of her condition requiring an accommodation would be subject to change once Ms. Alston underwent surgery.

36.

On or around March 2, 2020, a representative from Defendant's Human Resources Success team (hereinafter, "HR") contacted Ms. Alston by phone.

37.

During this call, the HR representative told Ms. Alston that Defendant "could not accommodate the doctor's restrictions" because her position was full-time instead of a part time job.

38.

As a result, the HR representative told Ms. Alston on the call that she would have to go back out on STD leave and she would only be able to return to work once she received a full release, *without any medical restrictions*, from her doctor.

39.

On March 2, 2020, Ms. Alston was able to perform the essential functions of her job with or without a reasonable accommodation.

40.

On March 2, 2020, Ms. Alston neither requested, nor needed, to take STD leave.

41.

However, given the HR representative's directive and insistence that Defendant could not accommodate her disability, Ms. Alston felt that she had no other choice but to have her doctor fill out the forms in support of her request for STD leave.

42.

On or around March 23, 2020, Ms. Alston's doctor completed and returned an Attending Physician Statement for, Defendant's third-party benefits administrator. Within the Physician Statement, the medical provider indicated that Ms. Alston could only sit for four hours at a time.

43.

Consistent with her medical needs at the time, Ms. Alston's doctor made no mention in his Physician Statement that Ms. Alston needed to be on leave or out of work entirely.

44.

The physician also completed Defendant's Health Care Provider (hereinafter, "HCP") form. On the HCP form, the doctor once again explained that Ms. Alston could not sit continuously without breaks, and that he anticipated that Ms. Alston's condition would remain the same until July 2020, if not permanently, unless she received necessary surgery to treat the condition.

45.

Nowhere in the Physician Statement or HCP did the physician indicate that Ms. Alston needed to be taken out of work for an extended period of time or placed on leave.

46.

Consistent with the documents previously submitted to Defendant, Ms. Alston's doctor indicated that Ms. Alston could return to work if provided the accommodation that she requested.

47.

Moreover, Ms. Alston's physician indicated on the form that, notwithstanding a modified schedule, Ms. Alston would only need to be out of work for surgery and for regularly scheduled appointments with her medical providers, including one appointment per month with her orthopedic physician, one appointment per month with her primary care physician, one appointment per month with her psychiatrist, and one appointment per month with the pain clinic.

48.

When Ms. Alston's physician filled out the HCP form, he was unable to indicate whether Ms. Alston was able to perform the essential functions of her position because Defendant failed to provide a copy of Ms. Alston's job description.

49.

On or around March 16, 2020, Ms. Alston saw an orthopedic specialist to treat her knee contusion, and the specialist provided an Attending Physician Statement to Defendant's third-party benefits provider and another completed HCP form to Defendant.

50.

In both documents, and consistent with her primary care physician, the specialist explained that Ms. Alston needed to avoid prolonged walking and standing and that she should not be expected to climb, push, or pull.

51.

The specialist did not provide any restrictions regarding Ms. Alston's ability to sit for eight hours. On the Physician Statement, the specialist circled the option indicating that Ms. Alston could sit for eight hours continuously.

52.

Additionally, the specialist, who had seen Ms. Alston on March 10, 2020, indicated on the Physician Statement that Ms. Alston could return to work on March 10, 2020, on a full-time basis, but with light duty.

53.

When Ms. Alston visited the orthopedic specialist, she knew that Defendant would not provide her with an accommodation, but she was hopeful that the restrictions provided by the specialist would allow for her to return to work, despite the pain that she was experiencing and her legitimate need for an accommodation.

54.

On or around March 25, 2020, Ms. Alston's psychiatrist recommended to her that she should need take a period of leave until June 3, 2020.

55.

Previously, in February and March 2020, Ms. Alston had lost several members of her close and immediate family and Ms. Alston had personally been the victim of a physical assault.

56.

As a result of the grief associated with losing a family member and the mental impact of being assaulted, Ms. Alston began experiencing symptoms associated with depressive disorder, anxiety, and post-traumatic stress disorder (hereinafter, "PTSD").

57.

Moreover, the physical pain that Ms. Alston was experiencing, along with Defendant's ongoing refusal to provide Ms. Alston with a reasonable accommodation that would have allowed her to return to work, exacerbated Ms. Alston's aforementioned mental health conditions.

58.

As a result, the psychiatrist recommended that, when Ms. Alston was able to return to work, that Defendant allow her to telework so that she could avoid stressful situations in the workplace to allow her time to treat and heal her mental health conditions.

59.

After Ms. Alston's March 25, 2020 appointment with her psychiatrist, and based on this doctor's recommendation, Ms. Alston reached out to one of Defendant's HR to inquire as to whether she would be permitted to work remotely.

60.

During this conversation, the HR representative denied Ms. Alston's request to telework, stating that Ms. Alston's position was not one that could be performed remotely.

61.

Ironically, not even two weeks after Ms. Alston's conversation with the HR Representative, Defendant mandated many of its employees begin teleworking due to the COVID-19 pandemic.

62.

Ms. Alston's fellow CSR Account Experts in the Augusta Call Center were among those employees that Defendant required to work from home.

63.

When Ms. Alston learned that other employees had been permitted to work remotely, Ms. Alston submitted a request that she be permitted to do the same.

64.

However, Defendant entirely failed to respond to Ms. Alston's request to telework in around March 2020.

65.

As a result, Defendant never authorized Ms. Alston to work remotely.

66.

Meanwhile, as of March 16, 2020, Ms. Alston had apparently exhausted her STD benefits. Around that time, one of Defendant's HR representatives contacted Ms. Alston to advise her that she would need to apply for Long Term Disability (hereafter, "LTD") leave since her STD benefits had been exhausted.

67.

At that time, Ms. Alston did not need LTD leave or STD leave, she was prepared to return to work, and she was able to perform the essential functions of her position with or without a reasonable accommodation.

68.

Despite contacting Ms. Alston in early March to inform her that she needs to go on LTD, Defendant failed to provide Ms. Alston with the LTD application that she and her medical providers needed to complete until April 2020.

69.

On or around April 2, 2020, Ms. Alston saw her physician specializing in sports medicine, who completed an Attending Physician Statement that Defendant provided for Ms. Alston to provide to the third-party benefits administrator for LTD benefits.

70.

In this Physician Statement, the sports medicine doctor stated that Ms. Alston was physically able to work as of March 10, 2020.

71.

On the form, the sports medicine doctor explicitly stated, "Not taken out of work – May work light duty starting 3/10/20 – [Ms. Alston] can work from home."   The doctor also recommended that Ms. Alston should refrain from standing or walking for prolonged periods of time.

72.

Under the sports medicine doctor's recommendation, Ms. Alston would have been physically able to work a full, eight-hour shift, so long as she was working from home, which was consistent with her psychiatrist's recommendation.

73.

On or around April 8, 2020, Ms. Alston's primary care physician also completed another Attending Physician Statement for benefits coordinator. In his medical documentation, the suggested an alternative to his initial recommendation that Ms. Alston be allowed to work a part-time schedule. Specifically, the primary care doctor recommended that Ms. Alston be permitted to take a short break after each time that she had been seated for more than one hour.

74.

The primary care physician's new, aforementioned restriction would have allowed Ms. Alston to work an entire eight-hour shift, so long as she was permitted to have short breaks to stretch in her knee.

75.

Despite filling out and returning all of the necessary paperwork and providing several of her medical providers' notes to Defendant and its benefits coordinator as soon as Ms. Alston was able, Defendant did not approve Ms. Alston's LTD leave application until several months later in June or July 2020.

76.

As a result, despite Ms. Alston's desire and ability to return to work, Defendant refused to allow her to do so during that time.

77.

Moreover, due to Defendant's delay in processing the LTD application, Ms. Alston was not receiving any income from the time that her STD ended in mid-March 2020 until the LTD benefits were approved in Summer 2020.

78.

Due to Defendant's delay in processing Ms. Alston's paperwork, Ms. Alston was unable to pay for many of her regular living expenses, including her rent, resulting in Ms. Alston becoming homeless, which only exacerbated Ms. Alston's depressive disorder, anxiety, and PTSD.

79.

On or around June 19, 2020, Ms. Alston underwent surgery on her right knee. During her post-op recovery, she remained without a place to live due to Defendant's failure to timely process her LTD application.

80.

While Ms. Alston was undergoing recovery, without a bed to sleep in, Ms. Alston experienced another tragedy in her life when she lost another member of her immediate family.

81.

Based on having to endure extreme financial hardships, recovering from surgery without having a place to live, and dealing with the loss of several close family members, all while Defendant refused to process Ms. Alston's restrictions and allow her to work and delayed processing her LTD application, Ms. Alston's mental health deteriorated rapidly.

82.

As a result of the deterioration of her mental condition, Ms. Alston's psychiatrist was forced to make the decision on or around July 30, 2021, to keep Ms. Alston out of work until at least January 8, 2021.

83.

After Ms. Alston's psychiatrist submitted a new HCP form on July 30, 2020, three of Defendant's representatives reached out to Ms. Alston via conference call.

84.

These three individuals told Ms. Alston that Defendant would not accommodate her requests.

85.

Additionally, on the same call, Defendant's representatives told Ms. Alston that, if she could not return to work immediately, she would be fired.

86.

Ms. Alston found the information that she was being told so distressing that she experienced an actual panic attack while she was on the call, which forced her to abruptly end to the conversation.

87.

Furthermore, during this conversation, none of Defendant's representatives even tried to ask Ms. Alston how she was doing, nor attempt to discuss any options to allow Ms. Alston to return to work.

88.

Instead, Defendant's representatives used this call as an opportunity to explicitly convey the same message that Ms. Alston had been hearing from Defendant all along – either Ms. Alston return to work, without *any* medical restrictions or accommodations, or she would be terminated.

89.

On or about July 31, 2020, Ms. Alston's primary case physician  supplied Defendant with another completed HCP form.  On this firm Ms. Alston's doctor certified that Ms. Alston would be able to return to work on November 1, 2020, and, once again, the doctor stated that Ms. Alston only needed to be permitted to take a break every hour to assist with the management of her pain.

90.

While the primary care physician's addressed Ms. Alston's physical condition, he referred Defendant to Ms. Alston's psychiatrist for information concerning Ms. Alston's mental condition.

91.

This form also asked whether, based on the attached job description, whether Ms. Alston could perform the essential functions of her position. Similar to the form that he filled out in March 2020, the primary care physician indicated that he was not able to answer this question because the job description was "! Not attached !"

92.

Even though Ms. Alston's LTD leave had been approved in Summer 2020, Defendant began harassing Ms. Alston on a routine basis.

93.

Specifically, she would receive emails from HR representatives, threatening to terminate her employment if she did not respond within unreasonably short periods of time.

94.

For example, on August 12, 2020, after she had just discussed the matter by telephone, Ms. Alston received an email from Defendant's Accommodation Manager stating, in pertinent part, "T-Mobile is reviewing whether additional leave would be a reasonable accommodation and, if not, one possible outcome is that your employment with T-Mobile would end."

95.

Subsequently, Defendant would contact Ms. Alston several times per month via telephone and/or email, making similar threats to terminate Ms. Alston's employment, even though Defendant was aware that its third-party benefits coordinator had approved the STD leave and that Ms. Alston's medical providers had provided a return to work in January 2021.

96.

In October 2020, Ms. Alston had become so distressed by Defendant constant badgering of her, that she sent an email to Defendant's HR representatives, explaining that all she wanted to do was to go back to work and that the entire situation had been caused by Defendant's initial decision to place Ms. Alston on leave that was not actually needed.

97.

On October 20, 2020, Ms. Alston also requested that Defendant communicate with counsel concerning her leave and requests for accommodation.

98.

However, Defendant largely refused to communicate through counsel, and Defendant's employees continued to badger Ms. Alston and threaten to terminate her employment.

99.

On or around January 14, 2021, Ms. Alston received an email from Defendant's Employee Success Manager, informing Ms. Alston that if she did not contact Defendant and provide medical documentation regarding her need for additional leave by January 18, 2021, Defendant would consider Ms. Alston to have voluntarily resigned.

100.

On January 19, 2021, Ms. Alston, through counsel, confirmed that Ms. Alston was able to return to work immediately, and advising Defendant that, despite the fact that Ms. Alston had advised Defendant of her legal representation, Defendant was continuing to communicate directly with Ms. Alston, without even copying counsel on written communications.

101.

Having not received a response to the January 19, 2021 email, Ms. Alston, again through counsel, followed up with Defendant on February 16, 2021, advising Defendant that Ms. Alston had been cleared to return to work and asking to discuss the reasonable accommodations that Defendant would be able to provide.

102.

In the February 16, 2021 email, also advised Defendant that Ms. Alston's supervisors had threatened she would be terminated on February 20, 2021.

103.

Having not received a response to the email on February 16, 2021, Ms. Alston, through counsel, followed up with Defendant on February 18, 2021.

104.

On February 22, 2021, two days after Defendant was supposedly going to terminate Ms. Alston's employment, Defendant responded stating, "Are you saying that Ms. Alston has been released to work? And that she wishes to return to work?"

105.

The following day, February 23, 2021, Ms. Alston's counsel confirmed that Ms. Alston was prepared to return and had been released by her doctor. Counsel also confirmed that, provided that Defendant's employees were teleworking, Ms. Alston would not need much more of an accommodation than to be allowed to take routine breaks and leave for her regularly scheduled medical and mental health appointments.

106.

Nearly two months later, on April 15, 2021, Defendant finally responded to the February 23, 2021 email, asking, "Is Ms. Alston prepared to return to work, and if so what accommodations would she require."

107.

The same day Ms. Alston, through counsel responded, referring to the email on February 23, 2021, and further clarifying that Ms. Alston had been prepared to work, and as provided in the

referenced email, that the accommodation needed would depend on whether Defendant's employees were working remotely.

108.

Despite the correspondence between Defendant's legal department and Ms. Alston's counsel, Defendant continued to send correspondence to Ms. Alston directly threatening to terminate her employment, or consider her to have voluntarily resigned, throughout Summer 2021.

109.

On August 16, 2021, Ms. Alston received another letter threatening to terminate her employment if she did not confirm her intent to return to work and provide supporting medical documentation by August 23, 2021.

110.

As a result, on August 18, 2021, Ms. Alston, through counsel, contacted Defendant's legal department, once again confirming that Ms. Alston was prepared to return to work with a reasonable accommodation and offering to provide any necessary medical documentation.

111.

Additionally, in email on August 18, 2021, Ms. Alston's counsel also explained that, as a result of all that she had been through, including the injury that she sustained in the workplace and the years of harassment that she had been subjected while assigned to the August Call Center, Ms. Alston was considering relocating to Tampa, Florida where she had the support system in place that she needed on account of her mental health.  As a result, Ms. Alston inquired as to whether Defendant had any equivalent, open positions in Defendant's Tampa Call Center that Defendant would be willing to provide as a reasonable accommodation.

112.

By August 26, 2021, after the supposed termination date, Defendant had failed to respond, so Ms. Alston directed her counsel to follow up with Defendant on her behalf that day.

113.

Defendant failed to respond to the August 26, 2021 email until September 26, 2021.

114.

In its message on September 26, 2021, Defendant advised Ms. Alston that it was not willing to consider Ms. Alston's requested accommodation of a transfer to an open position in the Tampa Call Center. Defendant further advised Ms. Alston that she should prepare to attend an onsite training at the Augusta Call Center on October 4, 2021.

115.

On October 13, 2021, Defendant apparently reconsidered its denial of Ms. Alston's request for an accommodation in the form of a transfer to an open position for which Ms. Alston was qualified in the Tampa Call Center.

116.

After Ms. Alston had been attempting work ever since she had placed by Defendant on STD leave seventeen months earlier, Defendant invited Ms. Alston to return to work and granted her request for a reasonable accommodation of a transfer to the Tampa Call Center in its October 13, 2021 email.

117.

However, when Ms. Alston's received Defendant's denial of her request for an accommodation in the form of a transfer the prior month, she felt as though she had exhausted all of her options, and as a result, she successfully gained employment elsewhere.

Procedural/Administrative Background

118.

On January 6, 2021, Ms. Alston submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on her disability and retaliation in violation of the Americans with Disabilities Act. The EEOC assigned Ms. Alston Charge Number 410-2021-02639.

119.

Defendant had notice of Ms. Alston's Charge of Discrimination, participated in the proceedings before the EEOC, and was represented by counsel during said proceedings.

120.

On September 29, 2021, the EEOC issued its Dismissal and Notice of Rights.

121.

Ms. Alston has exhausted her administrative remedies as to her Charge of Discrimination, and she is filing the instant action within ninety days of the EEOC's issuance and her receipt of a Dismissal and Notice of Rights.

## COUNT I:
## DISCRIMINATION BASED ON DISABILITY
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

122.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 121, as if the same were set forth herein.

123.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

124.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

125.

As alleged herein, Plaintiff was employed with Defendant for approximately eight years and served in the role of CSR Account Expert. Plaintiff was performing her duties in that role, and she was otherwise qualified and able to perform the essential function of her job, with or without a reasonable accommodation.

126.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

127.

As alleged herein, Plaintiff suffered from both physical impairments in the form of Type 2 diabetes, hypertension, fibromyalgia, sickle cell trait, and musculoskeletal conditions in her back and knee that Plaintiff sustained in an on-the-job injury and a motor vehicle collision, as well as mental impairments, including depressive disorder, anxiety, and post-traumatic stress disorder.

128.

As alleged, and as incorporated by reference herein, Plaintiff's physical and mental impairments substantially limit a number of Plaintiff's major life activities.

129.

Defendant was aware of Plaintiff's disabilities.

130.

As alleged herein, Defendant forced Plaintiff to take leave and short-term disability in March 2020, solely on account of Plaintiff's disability.

131.

As alleged herein, from March 2020 through October 2021, Defendant refused to allow Plaintiff to return to work, solely on account of Plaintiff's disability.

132.

Plaintiff will show that Defendant's stated reason for forcing Plaintiff on leave in March 2020, and its refusal to allow Plaintiff to return to work from March 2020 through October 2021, is pretextual, and that Defendant's actions were actually motivated by discriminatory animus as a result of Plaintiff's disability.

133.

Plaintiff has been injured by Defendant's discrimination based on disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, front pay and/or injunctive relief, compensatory and punitive damages in the maximum amount permitted by statute of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**FAILURE TO PROVIDE A REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

134.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 121, as if the same were set forth herein.

135.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

136.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

137.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

138.

As alleged herein, Plaintiff was employed with Defendant for approximately eight years and served in the role of CSR Account Expert. Plaintiff was performing her duties in that role, and she was otherwise qualified and able to perform the essential function of her job, with or without a reasonable accommodation.

139.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

140.

As alleged herein, Plaintiff suffered from both physical impairments in the form of Type 2 diabetes, hypertension, fibromyalgia, sickle cell trait, and musculoskeletal conditions in her back and knee that Plaintiff sustained in an on-the-job injury and a motor vehicle collision, as well as mental impairments, including depressive disorder, anxiety, and post-traumatic stress disorder.

141.

As alleged, and as incorporated by reference herein, Plaintiff's physical and mental impairments substantially limit a number of Plaintiff's major life activities.

142.

Defendant was aware of Plaintiff's disabilities.

143.

Defendant was aware of Plaintiff's need for a reasonable accommodation in order to perform the essential functions of her job.

144.

As alleged herein, Plaintiff requested reasonable accommodations from Defendant, which Defendant initially granted in Fall 2019.  However, beginning in February 2020 through October 2021, Defendant expressly refused to grant Plaintiff any reasonable accommodation for her disabilities.

145.

As alleged herein, Plaintiff and her medical and mental health providers proposed three different potential accommodations: 1) modified schedule; 2) intermittent breaks; and, 3) remote work.

146.

Subsequently, Plaintiff requested that Defendant provide her with a reasonable accommodation in the form of a reassignment to an equivalent, open position at another location.

147.

The accommodations requested by Plaintiff remained available, would have been effective, and would not have posed an undue hardship on Defendant.

148.

However, as alleged herein, Defendant chose to keep Plaintiff out of work and on leave – an accommodation that Plaintiff did not initially request nor need.

149.

Moreover, Defendant denied Plaintiff's requested accommodation reassigning her to an equivalent, open position at another location.

150.

In denying the aforementioned accommodations requested by Plaintiff, Defendant failed to engage in the interactive process to explore other accommodations that may have been available.

151.

Plaintiff's request for leave only stemmed, and as a result of, Defendant's failure to engage in the interactive process with Plaintiff and provide her with a reasonable accommodation for her disabilities.

152.

Plaintiff has been injured by Defendant's discrimination based on disability, due to its failure to engage in the interactive process and to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including

back pay, front pay and/or injunctive relief, compensatory and punitive damages in the maximum amount permitted by statute of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT III:**
**RETALIATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

153.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 121, as if the same were set forth herein.

154.

The Americans with Disabilities Act prohibits covered entities from discriminating against any individual because such individual has opposed any act or practice made unlawful by the Americans with Disabilities Act or because said individual has filed a Charge of Discrimination. 42 U.S.C. § 12203(a).

155.

The Americans with Disabilities Act prohibits covered entities from coercing, threatening or interfering with any individual in the exercise or enjoyment of her rights under the Americans with Disabilities Act.  42 U.S.C. § 12203(b).

156.

From December 2019 until October 2021, Plaintiff continuously exercised her rights afforded to her by the American with Disabilities Act of requesting reasonable accommodations for Plaintiff's disabilities.

157.

After Defendant received Plaintiff's request for reasonable accommodation, Defendant retaliated against Plaintiff by denying her requests for a reasonable accommodation, refusing to allow Plaintiff to return to work, and then by threatening to terminate her employment solely on the basis that she had engaged in said protected activity.

158.

Additionally, Defendant retaliated against Plaintiff by failing to provide a reasonable accommodation and threatening to terminate Plaintiff, solely on the basis that she had engaged in the protected activity of filing a Charge of Discrimination.

159.

On or about January 6, 2021, Plaintiff exercised her rights afforded to her by the American with Disabilities Act of filing a Charge of Discrimination with the Equal Employment Opportunity Commission.

160.

After Defendant became aware that Plaintiff had filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Defendant retaliated against Plaintiff by denying her requests for a reasonable accommodation, refusing to allow her to return to work, and then by threatening to terminate her employment solely on the basis that she had engaged in said protected activity.

161.

Plaintiff will show that Defendant's stated reason for denying her requests for a reasonable accommodation, refusing to allow her to return to work, and then threatening to terminate her

employment, is pretextual, and that Defendant's actions were actually motivated by discriminatory animus as a result of Plaintiff's disability.

162.

Plaintiff has been injured by Defendant's retaliation based on Plaintiff's participation in protected activities, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, front pay and/or injunctive relief, compensatory and punitive damages in the maximum amount permitted by statute of not less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Keshia Alston respectfully prays for the following relief:

1) That Summons and Process be issued to Defendant T-Mobile USA, Inc., and that Defendant be served as provided by law;

2) That this matter be tried before a jury;

3) That judgment be awarded for and in favor of Plaintiff on Count I for discrimination based on disability and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

4) That judgment be awarded for and in favor of Plaintiff on Count II for discrimination based on disability, due to said Defendant's refusal to engage in the interactive process and failure to provide a reasonable accommodation and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

5)      That judgment be awarded for and in favor of Plaintiff on Count III for retaliation

and grant Plaintiff all relief allowable under the Americans with Disabilities Act; and,

6)      For such other relief as this Court shall seem just and proper.

Respectfully submitted, this 28th day of December, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
EMILY M. WALKER
Georgia Bar No. 221826
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
emw@cooperbarton.com